# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

In the Matter of the Search of:

Facebook account ID # 100000666378301 with the listed
User ID "Charles Edwards"

)
)
)
)
)
)

Case No. 16 M 165

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

- ◼ evidence of a crime;
- ◼ contraband, fruits of crime, or other items illegally possessed;
- ◼ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:   Title 18 U.S.C. 844(i) and 18 U.S.C 924(c) and 26 U.S.C. 5861(d), (e) & (f)

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested
   under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Luke Barker, ATF
_____
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: Nov. 2, 2016

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Honorable David E. Jones , U.S. Magistrate Judge
*Printed Name and Title*

# AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Luke Barker, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.  I am employed with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since November of 2015.  I attended the Federal Law Enforcement Training Center where I completed both the Criminal Investigator Training Program and the ATF Special Agent Basic Training program.  My duties as a Special Agent with ATF include investigating alleged violations of the federal firearms, arson, and explosives laws under the purview of the Gun Control Act (as amended) under Title 18 of the United States Code.  During the course of my career, I have had trainings regarding the use of social media in relation to criminal investigations.  Specifically, I have received instruction regarding the use of social media sites by criminal elements.  Additionally, I have conducted previous criminal investigations in which internet research that I conducted yielded the use of social media by suspects.  Specifically, I know from my training and experience that alleged suspects of criminal activity, who have accounts on social media websites, will often communicate their criminal intentions or past activity via "instant message" or "in-box message" on a given

social media website. The "instant message" / "in-box message" is a private communication from one user to another. Furthermore, I know through experience that many social media users often use social media websites as their primary means to communicate with others. Additionally, I know from training and experience that suspects who use social media websites sometimes post photographs of themselves possessing incriminating items, such as large amounts of cash, narcotics and firearms. Also, suspects in criminal investigations have been known to post statements on social websites referencing their own criminal activity.

2.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Charles Edwards (B/M DOB: 09/28/1964) has in his possession evidence of crimes committed in violations of Title 18 U.S.C. 844(i) (Arson of Property in Interstate Commerce), 18 U.S.C 924(c) (use of a Molotov Cocktail to commit a federal arson crime), and 26 U.S.C. 5861(d), (e) & (f), (possess, transfer or making a firearm not registered in the National Firearms Registration and Transfer Record).

4.      Under 26 U.S.C. § 5845(a) and (f), the definition of "firearm" includes a "destructive device", which includes: "(1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device;… and (3) any combination of parts either designed or intended for use in converting any device into

2

a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled."

5.     The definition of "make" under 26 U.S.C. § 5845(i) includes "manufacturing (other than by one qualified to engage in such business in this chapter), putting together, altering, any combination of these, or otherwise producing a firearm."

6.     There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

**IDENTIFICATION OF ITEMS TO BE SEARCHED**

7.     The Facebook page belonging to "Charles Edwards" - ID # 100000666378301, herein described as a personal website that is accessed with a username and password specific only to that page and further described in Attachment A.  The following Facebook Page URL, Facebook Username, and associated Facebook Identification Number: The applied-for warrant would authorize the search and recovery of evidence particularly described in Attachment B.

**PROBABLE CAUSE**

*Case Background*

8.     On August 13 and 14, 2016, the City of Milwaukee experienced civil unrest in the area of N. Sherman Blvd. and W. Burleigh St. and in the area of N. 35th St. and W. Burleigh St. The rioting was in response to the officer involved shooting that occurred at the intersection of N. 44th Street and W. Auer Ave. on August 13, 2016. On August 13, 2016, Sylville Smith was shot and killed by a police officer. In the aftermath of the shooting, there was civil unrest.

9.     In the course of civil unrest, subjects set seven commercial businesses on fire in the city of Milwaukee at the following businesses: BP Gas Station, 3114 N. Sherman Blvd., Milwaukee; O'Reilly Auto Parts, 3405 W. Fond Du Lac Ave., Milwaukee; Jet Beauty, 3501 W.

3

Burleigh St., Milwaukee; BMO Harris Bank, 3536 W. Fond Du Lac Ave., Milwaukee; PJ's Market, 3079 N. 21st St., Milwaukee; MJM Liquor, 2229 W. Fond Du Lac Ave.; Milwaukee; and Big Jim's Liquor, 2161 N. Hopkins Ave., Milwaukee. At all times pertinent to probable cause, the above businesses were engaged in and affected interstate commerce.

      10.     As a result of the aforementioned investigation, the ATF and law enforcement conducted and documented multiple witness interviews that indicated the manufacturing, possession, and use of "Molotov cocktails".

      11.     On August 16, 2016, the Milwaukee, Wisconsin, Police Department (MPD) recovered a glass bottle containing a liquid with a torn black cloth stuffed inside the bottle at 3284 N. Sherman Boulevard, Milwaukee, Wisconsin. I know from training and experience the aforementioned construction is consistent with the destructive device known as a "Molotov Cocktail" and herein referred to as a Molotov Cocktail.

      12.     On August 23, 2016, ATF was contacted regarding suspected Improvised Incendiary Devices (IID) located within a dumpster at 3284 N. Sherman Blvd., Milwaukee. ATF Special Agents traveled to the above location and discovered a brown cardboard box holding ten (10) glass bottles containing a liquid with cloth rags inserted into the openings. The responding agents smelled a strong odor of a petroleum distillate emanating from the dumpster, which is consistent with the presence of gasoline. From training and experience, the agents identified these devices as "Molotov cocktails". Some of the glass bottles holding the liquid and cloth wicks were labeled as Mike's Hard Lemonade, Everfresh Juice, Mystic, and Seagram's Wine Coolers.

      13.     The building manager for 3284 N. Sherman Blvd., Milwaukee, WI, gave to law enforcement two apartment complex surveillance videos from August 15, 2016 and August 16, 2016.

4

14.     Affiant is aware of the contents of those videos. The first video shows, on August 16, 2016, an unknown person who appears to drop off an item in the location where officers recovered a single Molotov Cocktail on August 16, 2016. The second video shows, on August 15, 2016, an unknown person who is carrying a brown box by the dumpster next to the apartment complex, which is consistent to where officers recovered a brown box containing multiple Molotov Cocktails on August 23, 2016.

15.     The above-referenced apartment complex videos show that both unknown persons walked in the area by Charles N. Edwards' apartment, which is unit #2. Through the apartment manager at 3284 N. Sherman Blvd., Milwaukee, affiant received information that the apartment manager has personal knowledge that a tenant, Charles N. Edwards, had video surveillance devices that appear to capture activity on the outside of his apartment unit. It is believed that Charles N. Edwards' video surveillance system captured the unknown persons suspected of possessing Molotov Cocktails on August 15, 2016 and August 16, 2016 at 3284 N. Sherman Blvd., Milwaukee, WI.

16.     On August 23, 2016, and while still on location at 3284 N. Sherman Boulevard, Milwaukee, Wisconsin, ATF Special Agents observed a nozzle for a gas can under the porch of 3284 N. Sherman Boulevard, Apartment 2, Milwaukee, WI.  Agents spoke with the resident of this unit who was ultimately identified as Charles N. Edwards of 3284 N. Sherman Boulevard, Apartment 2, Milwaukee, WI.  Edwards explained to agents that this nozzle was part of a gas can he had for a generator.

17.     On August 26th, 2016, a juvenile Source of Information (SOI) was interviewed by ATF Special Agents regarding the fires started during the night of August 13, 2016, and morning of August 14, 2016.  The SOI stated they observed a subject light and throw a Molotov Cocktail

5

into the BP Gas Station located at 3114 N. Sherman Boulevard, Milwaukee, Wisconsin and pour flammable liquids onto the vehicles located at the BP gas station. SOI said this subject was then joined by two additional males who threw additional Molotov Cocktails into the gas station.

18.     Affiant verified that Charles N. Edwards currently resides at 3284 N. Sherman Blvd. Apt.#2, Milwaukee.

19.     On August 30, 2016, Milwaukee County Judge Timothy Witkowiak signed a search warrant for Charles N. Edwards' residence located at 3284 N. Sherman Boulevard Apartment #2, Milwaukee, to search for evidence of narcotics and guns.

20.     During the search of Charles N. Edwards' residence on August 30, 2016, law enforcement agents located one empty gas can and one gas can with remnants, inside of a bedroom; a gas can nozzle within the apartment's yard; and bottle caps in the yard that were consistent with the types of bottles used to construct the Molotov cocktails that were recovered on August 23, 2016.

21.     An inquiry into the National Firearm Registration and Transfer Record revealed that Charles N. Edwards was not of record.

22.     An inquiry into the criminal history of Charles N. Edwards shows in 1998 he was convicted of a felony burglary, and the conviction is unreversed.

23.     Information was developed through the course of the investigation that led to the arrest of a juvenile, A.T. On September 14, 2016, A.T. stated he was questioned by law enforcement agents. A.T. stated he was at the BP Gas Station, located at 3114 N. Sherman Blvd., Milwaukee, on the evening of August 13, 2016. A.T. explained that he threw a Molotov cocktail onto a car, which was parked in the BP Gas Station parking lot. A.T. stated this action caused the car to start on fire. A.T. described the Molotov cocktail as a "bottle with fire in them". A.T. further

6

stated he was given the Molotov cocktail by another juvenile, R.M. A.T. stated on August 13, 2016, R.M. threw a Molotov cocktail into the rear door of the BP Gas Station which ignited the storage room. A.T. stated that R.M. was provided several Molotov cocktails from Charles Edwards, a man who is in a wheelchair A.T. identified Edwards through a photo. A.T. stated R.M. told him that Edwards had numerous Molotov cocktails in a bag that was on his wheelchair.

24. Affiant has personal knowledge that Charles Edwards uses a wheelchair.

25. Information was obtained through an interview with a juvenile, J.P. J.P stated he was present at Charles Edwards' apartment within days after the riots. J.P. said he witnessed Molotov Cocktails being manufactured in the presence of Charles Edwards. He further stated Charles Edwards provided the knife that was used to cut the wicks for the Molotov Cocktails and also observed a bag of rocks which were to be thrown at police as a diversion so that others could throw Molotov Cocktails at Milwaukee Police Department District 7.

26. Information was obtained through an interview with a cooperating suspect. A juvenile suspect, K.H. stated he was present at Charles Edwards' apartment and witnessed Van Mayes manufacturing Molotov Cocktails within days after the riots.

27. On August 29, 2016, law enforcement conducted a search warrant at the residence of Van L. Mayes, which was located at 2746A N. 49th Street, Milwaukee. Law enforcement agents observed a full bottle of a Seagram's Wine Cooler and one empty bottle of Everfresh Juice. These bottles were consistent with the types of bottles used in the construction of the Molotov cocktails recovered by law enforcement on August 23, 2016, from the dumpster located at 3284 N. Sherman Blvd., Milwaukee. During the search warrant, Mayes told law enforcement agents that he transported two gasoline cans and Seagram's Wine Cooler bottles to a man named "Charles" who

7

uses a wheelchair and resides around Sherman Blvd., Milwaukee. Mayes further stated he left the two cans of gasoline at Charles' residence.

28.    During an interview with law enforcement, Van Mayes admitted that he communicates with Charles Edwards via Facebook Instant Messenger. Affiant is also aware that Van Mayes communicates to his followers and friends via his Facebook account through pictures, videos, and text.

29.    Affiant knows that Mayes has a Facebook account profile "Vaun L Mayes" with a Facebook ID # 504112393. This Facebook account contains photographs and videos of Mayes, and the identification of Mayes has been verified through a comparison by law enforcement to Milwaukee Police Department booking photo of Van L. Mayes, B/M, 03-01-1987.

30.    Law enforcement viewed the "Vaun L Mayes" Facebook account, which showed a 48-second video from August 13, 2016. Mayes was speaking in the video. Law enforcement was able to verify that Mayes was the person speaking in the video and taking the video because he films himself during the video. The video depicts subjects, on August 13, 2016, damaging Milwaukee Police Department squad (2005 Chevy Impala black 4 door bearing WI auto plate #740-JYE, VIN #2G1WF55K059378485). The subjects are seen damaging the squad car with chunks of concrete and then setting it on fire with what is believed to be a road flare from the trunk of the squad car. Mayes is heard encouraging the subjects. Mayes appears to be within 1 foot of the squad car, and he captured some images of the actors involved. This video was posted on August 13, 2016 at about 9:20PM. After law enforcement viewed the video, it was removed from Mayes' Facebook account.

31.    Affiant knows Mayes posted another video to his Facebook account in which the squad car is on fire and someone has placed a suspected road flare into the squad car's gas

8

reservoir. This video was posted on August 16, 2016, at about 4:12AM. After law enforcement viewed the video, it was removed from Mayes' Facebook account.

32.　　While in jail on September 5, 2016, Charles Edwards placed a recorded call to an unknown female. During the call Edwards asked the unknown female to contact "Corey Miles" and "Marie Miltown" via Facebook.

33.　　Your affiant believes additional information relevant to the BP Gas Station arson and other crimes related to arson and creating Molotov cocktails is housed within the Facebook account ID # 100000666378301 with the listed User ID "Charles Edwards."  Additional relevant information includes pictures, text, and geographic information that will assist in identifying the arson suspects.

*FACEBOOK INFORMATION*

34.　　Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

35.　　Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

36.　　Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group

9

identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

37. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

38. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

10

39.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

40.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

41.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

42.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

43.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

44.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

45.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

46.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

47.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

48.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

49.     Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the

12

group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

50.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

51.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

52.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may

13

communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

53. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and

14

Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

54.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

55.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

56.     Based on the forgoing, I request that the Court issue the proposed search warrant.

57.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court of the Eastern District of Wisconsin is a district court of the

15

United States that has jurisdiction over the offense(s) being investigated, 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

16

**ATTACHMENT A**

*Property to Be Searched*

This warrant applies to information between August 13, 2016 and the present date associated with the Facebook account ID # 100000666378301 with the listed User ID "Charles Edwards" that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.

# ATTACHMENT B

## Particular Things to be Seized

## I.  Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

a.  All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

b.  All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

c.  All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

d.  All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e. All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

f. All "check ins" and other location information;

g. All IP logs, including all records of the IP addresses that logged into the account;

h. All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i. All information about the Facebook pages that the account is or was a "fan" of;

j. All past and present lists of friends created by the account;

k. All records of Facebook searches performed by the account;

l. All information about the user's access and use of Facebook Marketplace;

m. The types of service utilized by the user;

n. The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

o. All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

p. All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

2

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18 U.S.C. 844(i) (arson of property in interstate commerce), 18 U.S.C 924(c) (use of a Molotov Cocktail to commit a federal arson crime), and 26 U.S.C. 5861(d), (e) & (f), (possess, transfer or making a firearm not registered in the National Firearms Registration and Transfer Record) since August 12, 2016 for each user ID identified on Attachment A, information pertaining to the following matters:

(a) The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between Edwards and others related to the relevant offense conduct of commercial arson, possessing or making Molotov cocktails, and possessing Molotov cocktails while committing a crime of violence.

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(e) The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of commercial arson, possessing or making Molotov cocktails, and possessing Molotov cocktails while committing a crime of violence, including records that help reveal their whereabouts.

3

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the

laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information

contained in this declaration is true and correct.  I am employed by Facebook, and my official

title is _____.  I am a custodian of records for Facebook.  I state

that each of the records attached hereto is the original record or a true duplicate of the original

record in the custody of Facebook, and that I am the custodian of the attached records consisting

of _____ (pages/CDs/kilobytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of

the matter set forth, by, or from information transmitted by, a person with knowledge of those

matters;

b.      such records were kept in the ordinary course of a regularly conducted business activity

of Facebook; and

c.      such records were made by Facebook as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal

Rules of Evidence.


_____          _____
Date                                                Signature